1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jay T. Jambeck, SBN #226018
jjambeck@leighlawgroup.com
Mandy G. Leigh, SBN # 225748
mleigh@leighlawgroup.com
Damien B. Troutman, SBN # 286616
dtroutman@leighlawgroup.com
LEIGH LAW GROUP, P.C.
582 Market Street, Suite 905
San Francisco, CA 94104
Telephone: 415-399-9155
Facsimile: 415-795-3733

Attorney for Plaintiffs
TIDE RISING; A.P.,
a minor, by and through
his Guardian ad Litem; J.P.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIDE RISING, an unincorporated association of parents and guardians; A.P., a minor, by and through his Guardian ad Litem; J.P. | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| SEQUOIA UNION HIGH SCHOOL DISTRICT, | ) ) |
| Defendant. | ) ) |

**Case No.**: 3:26-cv-00987-TLT

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF A TEMPORARY RESTRAINING ORDER**

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

i

**TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................1

II. STATEMENT OF FACTS ......................................................................................2

    A. TIDE Academy's Unique Role as a Structural Accommodation .....................2

    B. The District's Rushed Closure Process ..........................................................7

    C. Public Records Act Response Reveals Predetermined, Managed Process........9

III. LEGAL STANDARD ..........................................................................................10

IV. ARGUMENT .......................................................................................................10

    A. Plaintiffs Are Likely to Succeed on the Merits ............................................10

        1. Legal Framework for ADA Title II and Section 504 Claims................10

        2. TIDE Academy Functions as a Structural Accommodation ..................11

        3. The Closure Constitutes Discrimination Against Students with Disabilities............13

           a. Plaintiffs are qualified individuals with a disability............................13

           c. Discrimination is by reason of disability .........................................14

               i. Disparate Impact ................................................................15

               ii. Deliberate Indifference ....................................................18

               iii. Failure to Provide Reasonable Accommodation.........................20

        4. The Closure Forces Students Into More Restrictive Environments.......................25

    B. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief .................28

    C. The Balance of Equities Tips in Plaintiffs' Favor .........................................30

    D. The Public Interest Favors Injunctive Relief................................................31

V. EXHAUSTION OF ADMINISTRATIVE REMEDIES IS NOT REQUIRED .........................31

VI. CONCLUSION ...................................................................................................32

# TABLE OF AUTHORITIES

## <u>Cases</u>

*A.J.T. v. Osseo Area Sch. Dist. No. 279,* 604 U.S. ___, 145 S. Ct. 1528 (2025) ................10, 14, 21

*Alexander v. Choate,* 469 U.S. 287 (1985) ...............................................................11

*All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127 (9th Cir. 2011) ...............................10

*Arc of Wash. State Inc. v. Braddock,* 427 F.3d 615 (9th Cir. 2005)...................................24

*Crowder v. Kitagawa,* 81 F.3d 1480 (9th Cir. 1996) ...................................................13, 15

*Duvall v. County of Kitsap,* 260 F.3d 1124 (9th Cir. 2001) ......................................18,20, 25

*Fry v. Napoleon Cmty. Schs.,* 580 U.S. 154 (2017) ......................................................32

*Gamble v. City of Escondido,* 104 F.3d 300 (9th Cir. 1997) .............................................15

*Humphrey v. Memorial Hospitals Ass'n,* 239 F.3d 1128 (9th Cir. 2001) ..................................24

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.,* 725 F.3d 1088 (9th Cir. 2013) .......................13

*Lau v. Nichols,* 414 U.S. 563 (1974)...................................................................16,18

*Mark H. v. Hamamoto,* 620 F.3d 1090 (9th Cir. 2010) .....................................................15

*Melendres v. Arpaio,* 695 F.3d 990 (9th Cir. 2012) ......................................................28

*Olmstead v. L.C.,* 527 U.S. 581 (1999) .................................................................16

*Payan v. L.A. Cmty. Coll. Dist.,* 11 F.4th 729 (9th Cir. 2021) ......................................11, 14

*Payan v. L.A. Cmty. Coll. Dist.,* No. 2:17-cv-01697-SVW-SK, 2018 U.S. Dist. LEXIS 225042
    (C.D. Cal. Oct. 16, 2018) ..........................................................................24

*Perez v. Sturgis Public Schools,* 598 U.S. 142 (2023) ..................................................32

*PGA Tour, Inc. v. Martin,* 532 U.S. 661 (2001)..........................................................22

*Rodde v. Bonta,* 357 F.3d 988 (9th Cir. 2004) ..........................................................13

*Townsend v. Quasim,* 328 F.3d 511 (9th Cir. 2003) ......................................................24

*Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565 (2d Cir. 2003).....................................15, 16

*Vinson v. Thomas,* 288 F.3d 1145 (9th Cir. 2002) ...................................................21, 22, 24

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008) ..............................................10

*Wong v. Regents of Univ. of Cal.,* 192 F.3d 807 (9th Cir. 1999) ........................................21

*Zukle v. Regents of Univ. of Cal.,* 166 F.3d 1041 (9th Cir. 1999)......................................21

## <u>Statutes</u>

Americans with Disabilities Act, Title II, 42 U.S.C. §§ 12131–12134....................... passim

42 U.S.C. § 12132 ....................................................................................10

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ........................................... passim

29 U.S.C. § 701(b) ...................................................................................11

## <u>Regulations</u>

28 C.F.R. § 35.130(b)(7).............................................................................13

28 C.F.R. § 35.150(a)(3) ...................................................................18, 21, 22, 23

34 C.F.R. § 104.4(b)(1)–(4) ..............................................................8, 11, 17, 32

34 C.F.R. §§ 300.114–300.116 .......................................................................................25

**Rules**

Fed. R. Civ. P. 65(b)........................................................................................ passim

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I. INTRODUCTION

Plaintiffs TIDE RISING, A.P. (a minor, by and through his Guardian ad Litem, J.P.) respectfully submit this Memorandum of Points and Authorities in support of their Motion for a Temporary Restraining Order and Preliminary Injunction. Plaintiffs seek immediate injunctive relief to prevent Defendant Sequoia Union High School District (the "District") from closing TIDE Academy, a small, specialized high school that serves as a critical structural accommodation for students with disabilities.

TIDE Academy is not merely a school preference; it is the functional equivalent of an accessibility ramp for students with autism, anxiety disorders, ADHD, and other disabilities that make large, comprehensive high school campuses inaccessible. The District now proposes to demolish that ramp and scatter these vulnerable students across 2,000+ student campuses where they cannot function—all under the pretext of financial necessity that the District's own data does not support.

The District's decision to close TIDE Academy violates Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act because it eliminates a structural accommodation that provides students with disabilities meaningful access to education, disproportionately impacts a protected class, and forces students into more restrictive environments. Without emergency relief, the District's actions to implement the closure of TIDE will inflict immediate and irreparable harm on some of the most vulnerable students in the District.

1

MEMORANDUM

## II. STATEMENT OF FACTS

### A. TIDE Academy's Unique Role as a Structural Accommodation

TIDE Academy is a small, specialized public high school within the Sequoia Union High School District, serving approximately 200 students with a maximum capacity of 300. The school was specifically designed around "Nucleus" advisory cohorts and a small-campus environment that allows students with disabilities to access the general education curriculum without requiring restrictive interventions. (J.P. Decl. ¶ 8). From its inception, TIDE was positioned and marketed by the District as the small-school alternative within a district of large comprehensive campuses—the school where students who could not function in 2,000-student environments would be sent and could succeed. (J.P. Decl. ¶ 8). District counselors at other schools actively directed families of students with disabilities to TIDE. (Declaration of R.O. ¶ 3). These families relied on the District's own representations in choosing TIDE, uprooting their children from failing placements and entrusting them to a program the District told them was designed for students like theirs.

The impact of this structural design is reflected in the data. According to the District's 2023-24 School Accountability Report Cards (SARC), 20.2% of TIDE students are Students with Disabilities—more than double the rate of other District high schools such as Carlmont (9.2%). (J.P. Decl. at Ex. B., Pgs. 3, 19).[1] However, TIDE students with 504 Plans make up an *additional* 16.92% of the TIDE student population. (J.P. Decl. at Ex A, Pg. 8). Thus, TIDE's total disabled population is approximately 37% of the student body.

TIDE Academy ranks first among all District high schools for the A-G completion rate of students with disabilities, with approximately 41.18% of its graduates with disabilities meeting A-

---

[1] This data is the most recent publicly available published data; the District as of February 12, 2026 updated its SARC data and Plaintiffs have submitted the TIDE and Woodside High School. However, Plaintiffs are unable to update this filing due to the time sensitive nature of the matter.

2

MEMORANDUM

G requirements, significantly outperforming the state average of 23.61% and the county average of 30.69%. (J.P. Decl. at Ex. A, Pg. 39).

The concentration of students with disabilities at TIDE is not coincidental—it is the direct and foreseeable consequence of the District's own conduct. The District built TIDE as a small school. It promoted TIDE as the appropriate placement for students who could not thrive in large comprehensive settings. (Jambeck Decl. at EX. A, Pg. 7, 12, 16, 56, 63). Its own staff counseled families of struggling students to enroll at TIDE rather than remain at campuses where those students were failing. (Declaration of R.O. ¶¶ 2-4).

Those families followed the District's guidance, and their children succeeded. The declarations submitted herewith establish a consistent pattern: students with disabilities who were struggling, failing, or being denied services at large schools were directed to TIDE—and were able to access their education. Having induced these families to rely on TIDE as the structural accommodation for their children's disabilities, the District now proposes to pull the rug out from under them without any individualized assessment of the consequences and without any genuine fiscal emergency requiring such drastic action.

The declarations submitted in support of this motion demonstrate why TIDE Academy functions as a structural accommodation:

Declarant M.L. explains that her son, who is on the autism spectrum with anxiety, was unable to access his education in his previous public school environment. At TIDE, professionals scheduled a meeting within one week to address concerns, observed her son in class, and developed an IEP. She states: "At TIDE, my son is the happiest he has ever been in a school environment." (Declaration of M.L. ¶¶ 2-12).

3

MEMORANDUM

1    Declarant C.L. describes her child's experience with ADHD, dyslexia, dyscalculia, and

2    dysgraphia. At a traditional high school, her child struggled despite formal accommodations because

3    "traditional school structures, even when accommodations exist on paper, are not designed in a way

4    that allows my child to succeed." At TIDE, "accommodations are integrated directly into the

5    classroom" and her child "has been thriving academically, socially, and emotionally." Declaration

6    of C.L. ¶¶ 2-13.

7    Declarant R.O. recounts how her son was "incessantly bullied" and "struggled

8    academically" at a large middle school until an 8th grade counselor recommended he consider TIDE

9    for its small environment. She states: "I will be forever grateful to [the Menlo-Atherton (M-A)

10   counselor] for her honesty. After hearing all about our son and his struggles, she reached across the

11   table, held my hand and said M-A was the wrong place for our son, we should really consider TIDE."

12   Her son later faced a rare medical condition requiring weeks of absence, but TIDE's small size

13   allowed "every single teacher [to work] individually with him" to keep up. Declaration of R.O. ¶¶

14   2-4.

15   Declarant T.O. explains that her daughter has a 504 plan for General Anxiety Disorder and

16   ADHD, inattentive type, but "has not once requested to use the accommodations in her plan"

17   because TIDE's environment already provides what she needs. She emphasizes: "In many cases, it

18   is the *environment* that creates the need for the accommodations, not the child." Declaration of T.O.

19   ¶¶ 2-7 (emphasis in original).

20   Declarant E.W. describes her daughter as autistic and gifted ("twice exceptional"), with

21   sensory and emotional regulation challenges that make large school environments impossible. Her

22   daughter "cannot tolerate the sensory input, noise level, and constant stimulation of a large school

23   campus." TIDE is "the least restrictive environment in which she can access her education."

24

25

26                                            4

27                                      MEMORANDUM

28

1    Critically, her daughter requires asynchronous English courses due to emotional regulation

2    challenges, which TIDE permits but large comprehensive schools do not allow for graduation credit.

3    Declaration of E.W. ¶¶ 2-12.

4         Declarant J.L. describes her senior daughter with a learning disability that makes

5    "performing under pressure very difficult." At TIDE, "the small teacher-to-student ratio has changed

6    everything." She concludes: "While her IEP exists on paper, TIDE is the only place where it is

7    implemented as intended." Declaration of J.L. ¶¶ 3-5.

8         Declarant J.P. is the parent of two children who have required educational accommodations.

9    His older child attended Woodside High School and Menlo-Atherton High School, where

10   accommodations "frequently broke down at the classroom level" despite good-faith efforts by staff,

11   because "counselors and support personnel were responsible for very large caseloads." His younger

12   child, A.P., has an IEP providing essential scaffolding. At TIDE, "accommodations are implemented

13   consistently, without placing undue strain on individual teachers or requiring students to continually

14   self-advocate." J.P. states that "there is a substantial risk that my child's legally required

15   accommodations would not be implemented consistently or effectively if forced to transition to

16   Woodside High School or another large high school." (Declaration of J.P. ¶¶ 16–26.)

17        Declarant D.W. describes her child V.B., diagnosed with anxiety and maintaining a 504 plan,

18   who spent two and a half years at Sequoia High School—a large comprehensive campus—where

19   V.B. was "overlooked, overwhelmed, and shutting down emotionally." Despite being on the honor

20   roll, V.B. experienced panic attacks, dissociation, and mounting attendance problems. The SHS

21   Wellness Center staff pressured V.B. to return to class rather than providing support, and the school

22   lost V.B.'s name-change form three times. By junior year V.B. was in crisis and entered a partial

23   hospitalization program; not one friend or teacher at SHS called to ask where they were. After

24

25

26                                          5

27                                    MEMORANDUM

28

transferring to TIDE, V.B. "wanted to go to school," was named Student of the Month, became president of the drama club, and graduated. D.W. states: "The difference was not the 504 plan—it was the environment. TIDE saved my child's future." Declaration of D.W. (re V.B.) ¶¶ 4–18.

Declarant D.W. also describes her son A.R., a current TIDE freshman diagnosed with Autism Spectrum Disorder who has a 504 plan for autism and anxiety. A.R. shadowed at Sequoia, Woodside, TIDE, and Junipero Serra, and found that only TIDE's environment "accommodated his condition in a way that allows him to access his education." D.W. states that Woodside "was and would be overwhelming for A.R." and describes it as a "sink or swim" environment. At TIDE, A.R.'s math teacher noticed that instead of following directions to explain why a problem could not be solved, A.R. solved it using imaginary numbers—a concept three years beyond his current class. D.W. explains that A.R. "needs a school small enough that the teacher will know him" and will recognize his abilities rather than penalize him for not following rote instructions. Declaration of D.W. (re A.R.) ¶¶ 3–8.

In its marketing materials for TIDE, the District described TIDE as follows: "Welcome to TIDE Academy. We are a small and diverse public high school. We support students' academic and social development in a safe collaborative learning environment that prepares them for college and career pathways." (Jambeck Decl. Ex A at 6). Moreover, the District stated "TIDE is a unique gem in the Sequoia Union High School District as a small, public high school.  Small community allows more focus on students who are supported academically and social emotionally with Nucleus, our advisory class and small counselor caseloads." (Jambeck Decl. Ex A at 18).  The materials further described TIDE as a "Whole School Support." (*Id.* at Ex. A, Pg. 94, 95).

TIDE's Lead Counselor, Lara Sandora, who coordinates 504 services for 11th and 12th grade students, confirms that many TIDE students arrived after being bullied, experiencing significant

6

MEMORANDUM

mental health distress, or failing academically in larger school environments. (Declaration of Sandora ¶ 4.) When those students stabilize and succeed at TIDE, "the most significant change is not a new IEP, a new 504 Plan, or a new set of written accommodations. The most significant change is the environment. For many students with 504 Plans and IEPs, the environment itself is the intervention." (Declaration of Sandora ¶ 4.) TIDE operates the only Wellness Center in the District where students can access, in a single location, their school counselor, therapist, school psychologist, health aide, Guidance Information Specialist, and a dedicated wellness room. (Sandora Decl. ¶ 7.) No other school in the District provides this consolidated model. (*Id.*)

**B. The District's Rushed Closure Process**

On November 12, 2025, the Board of Trustees directed the Superintendent to develop a timeline for TIDE's potential closure. During initial "listening meetings" on November 19 and 20, 2025, Superintendent Crystal Leach explicitly stated that finances were *not* the reason for considering closure. (J.P. Decl. ¶ 2).

Yet by the January 26, 2026 study session, the District had shifted its justification entirely to financial considerations. (J.P. Decl. ¶ 3). Critically, the District admitted that per-student special education costs would simply "shift in location" rather than decrease, undermining the financial rationale. *Id.*

There is no fiscal emergency. The District holds a "Positive Certification" with the State of California, indicating it can meet its financial obligations for the current and subsequent two fiscal years. (J.P. Decl. ¶ 13, Ex. C at 1). The District has not identified any imminent budget shortfall that would require the immediate elimination of a school serving 200 students, a substantial portion of whom have documented disabilities. Indeed, closure may *increase* costs: students who cannot

7

MEMORANDUM

1  function at large campuses will require Non-Public School placements at $75,000 or more per year

2  per student, far exceeding TIDE's per-pupil cost. (Sandora Decl. at ¶12).

3        Equally significant is what the District failed to consider before targeting TIDE for closure.

4  The District conducted no apparent analysis of less discriminatory alternatives. (J.P. Decl. ¶¶ 5–6).

5  It did not meaningfully evaluate reductions in administrative overhead—despite the fact that the

6  District's own data, presented at the January 26, 2026 study session, identified that eliminating eight

7  District Office administrative positions would yield approximately $2.5 million in savings—the

8  same figure the District projected from closing TIDE Academy. (J.P. Decl. Ex. A at 119.) The

9  District chose to close the school serving 37% Students with Disabilities rather than reduce central

10 office staffing, without any analysis of why the option that eliminates an accommodation for

11 students with disabilities was preferable to the option that does not.  (J.P. Decl. ¶¶ 5–6). It did not

12 consider consolidating administrative functions, reducing non-classroom expenditures, or

13 restructuring operations at its larger campuses. Instead, it selected the single school that

14 disproportionately serves students with disabilities for elimination. (J.P. Decl. ¶ 6).  Under Title II

15 and Section 504, a public entity may not adopt a course of action with a disparate impact on

16 individuals with disabilities when less discriminatory alternatives exist. 28 C.F.R. § 35.130(b)(8);

17 34 C.F.R. § 104.4(b)(4). The District's failure to explore any alternative to closure before voting to

18 shut down TIDE is itself evidence that the financial justification is pretextual.

19        The District's process was further tainted by its admission that it had been informing

20 prospective families about the "potential closure" during open enrollment, depressing interest and

21 then citing the resulting "uncertainty" as justification for closure. (J.P. Decl. ¶4). The District

22 withheld responsive documents to Public Records Act requests until after the scheduled final vote.

23 (J.P. Decl. ¶ 6).

24

25

26                                    8

27                            MEMORANDUM

28

C.     **Public Records Act Response reveals predetermined, managed process**

The District's process was not a genuine deliberation. Rather, it was a pre-scripted communications exercise. Documents produced on February 9, 2026, in response to a Public Records Act request, reveal that by November 10, 2025 — two days before the Board of Trustees formally directed the Superintendent to begin a "public, community-involved process" — the District had already engaged an outside communications consultant, Heather McGowan of McGowan Impact Consulting, who had prepared a detailed "Communications Workplan" with draft talking points, draft parent emails, and a pre-set milestone timeline culminating in a "Board Meeting — Findings & Possible Vote" on January 14, 2026. (Jambeck Decl. Ex. B.) Every step of the purported community engagement process including "listening meetings," the "feedback summaries," the FAQ documents was pre-calendared as a deliverable in a public relations workplan before a single parent had been heard.

When a TIDE parent wrote to Board Member Mary Beth Thompson on November 14, 2025, describing her child's struggles and his success at TIDE, Thompson forwarded the email to the Superintendent and wrote: "FYI. I'll see what the consultant writes and then use it to draft something here, then send that along." (Jambeck Decl. Ex. C.) Superintendent Leach then drafted a detailed response for Thompson and instructed her to "BCC me and the board when you reply." (Id.) A Board that outsources its responses to a PR consultant and takes scripted direction from the Superintendent is not independently deliberating the impact of closure on students with disabilities — it is executing a predetermined outcome. This evidence further confirms that the District's invocation of financial necessity is pretextual: the decision to close TIDE was made before the financial data was presented at the January 26, 2026 study session, and the community process was designed to manage the message, not to evaluate the merits.

9

MEMORANDUM

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### III. LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

In the Ninth Circuit, courts may employ a "sliding scale" approach where "a stronger showing of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1135 (9th Cir. 2011). Under this approach, "serious questions going to the merits" and a hardship balance tipping "sharply" toward the plaintiff can support preliminary relief, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction serves the public interest. *Id.* at 1135.

### IV. ARGUMENT

#### A. Plaintiffs Are Likely to Succeed on the Merits

#### 1. Legal Framework for ADA Title II and Section 504 Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Section 504 of the Rehabilitation Act similarly prohibits discrimination against individuals with disabilities by recipients of federal financial assistance. 29 U.S.C. § 794.

In June 2025, the Supreme Court unanimously held that students with disabilities bringing ADA and Section 504 claims "are not required to make a heightened showing of 'bad faith or gross misjudgment' but instead are subject to the same standards that apply in other disability discrimination contexts." *A.J.T. v. Osseo Area Sch. Dist. No. 279*, 604 U.S. ___, 145 S. Ct. 1528

10

MEMORANDUM

1    (2025). For injunctive relief, plaintiffs need not prove intent to discriminate; the denial of an

2    accommodation is sufficient. *Id.*

3        The implementing regulations for Section 504 prohibit recipients from "utiliz[ing] criteria

4    or methods of administration . . . [t]hat have the effect of subjecting qualified handicapped persons

5    to discrimination on the basis of handicap." 34 C.F.R. § 104.4(b)(4). The District's decision to close

6    TIDE Academy constitutes precisely such a "method of administration" that has a discriminatory

7    effect.

8    **2. TIDE Academy Functions as a Structural Accommodation Providing Meaningful**

9    **Access**

10       The Supreme Court has held that Section 504 requires recipients of federal funds to provide

11   individuals with disabilities "meaningful access" to federally funded programs. *Alexander v.*

12   *Choate*, 469 U.S. 287, 301 (1985). The concept of meaningful access recognizes that

13   "[d]iscrimination against the handicapped was perceived by Congress to be most often the product,

14   not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect." *Id.* at

15   295.  An express purpose of the Rehabilitation Act is "to empower individuals with disabilities to

16   maximize ... independence, and inclusion ... into society, through ... the guarantee of equal

17   opportunity." 29 U.S.C. § 701(b)(1)(F).

18       TIDE Academy's small-school structure is not merely a preference—it is the mechanism by

19   which students with autism, anxiety disorders, ADHD, sensory processing disorders, and learning

20   disabilities access the general education curriculum. Although the District attempts to downplay this

21   fact in its current communications related to TIDE's closure, the District freely described TIDE as

22   such in ongoing communications. (Jambeck Decl. Ex. A at 17). The materials further described

23   TIDE as a "Whole School Support." *(Id.* at Ex. A, Pg. 94, 95).

24

25

26                                                  11

27                                          MEMORANDUM

28

The declarations establish that for many students with disabilities, TIDE's small campus, small class sizes, accessible staff, and integrated support services function as an architectural accommodation analogous to a wheelchair ramp. Just as a school district cannot remove a wheelchair ramp and tell wheelchair-bound students to use the stairs, the District cannot eliminate TIDE Academy and tell students with autism and anxiety disorders to simply "accommodate" in a 2,000-student campus when it has provided TIDE as an explicit accommodation. The result is the same: exclusion from meaningful participation in education.

Ms. Sandora, who has served as Lead Counselor at TIDE for five years and coordinates 504 services, confirms that TIDE's small campus provides a "structural accommodation for student wellness that cannot be replicated at the District's larger comprehensive high schools." (Sandora Decl. ¶ 5.) She explains that this model has "helped keep students with disabilities in the least restrictive environment of a general education setting" and that "[w]ithout this model, I believe a number of our students would require transition to a more restrictive therapeutic classroom setting, such as the District's STARS program, or to residential or non-public school placements." (Sandora Decl. ¶ 10.) This clinical assessment is corroborated by expert testimony. Mary Pacheco, a mental health professional at Stanford Psychiatry who works with adolescents with serious mental health conditions, IEPs, and 504 Plans, opines that for students with mental health and neurodevelopmental disabilities, academic success "is not a matter of motivation or ability but of environmental fit" and that "[t]he environment in which a student is placed can be the single most significant variable determining whether that student is able to attend school consistently, engage with the curriculum, and progress toward graduation." (Pacheco Decl. ¶ 4.)

12

MEMORANDUM

**3. The Closure Constitutes Discrimination against Students with Disabilities**

To state a prima facie case for a violation of Title II, "a plaintiff must show: (1) he is a 'qualified individual with a disability'; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability." *Payan*, 11 F.4th at 737. The requirements for violation of Section 504 are the same except for the added requirement of federal funding. *Id.*

The Ninth Circuit has consistently recognized that Section 504 and Title II reach disparate impact discrimination. In *Payan v. Los Angeles Community College District*, 11 F.4th 729, 738 (9th Cir. 2021), the court affirmed that Section 504 and the ADA "were specifically intended to address both intentional discrimination and discrimination caused by 'thoughtless indifference.'" *See also K.M. ex rel. Bright v. Tustin Unified Sch. Dist.,* 725 F.3d 1088 (9th Cir. 2013); *Rodde v. Bonta,* 357 F.3d 988 (9th Cir. 2004).

The Ninth Circuit has held that a policy denying meaningful access to individuals with disabilities violates Section 504 even without proof of discriminatory intent. *Crowder v. Kitagawa*, 81 F.3d 1480, 1483-84 (9th Cir. 1996) (quarantine requirement for guide dogs violated ADA because it "burden[ed] visually-impaired persons in a manner different and greater than it burden[ed] others").

Finally, discrimination under the ADA and Section 504 can be established by the denial of a reasonable accommodation/modification. 28 C.F.R. § 35.130(b)(7).

**a.    Plaintiffs are qualified individuals with a disability**

13

MEMORANDUM

Plaintiff A.P. is a student with a disabling condition whose IEP provides essential scaffolding for his education. (J.P. Decl. ¶ 21). Other TIDE RISING members are students with disabilities as well. (J.P. Decl. ¶¶ 16–17).

**b.    Plaintiffs will be excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity**

As the declarations submitted into evidence substantiate, Plaintiff A.P. and members of TIDE have experienced other large school environments and have encountered barriers to their education, including bullying, lack of accommodations and the structural environment of a large school. (J.P. Decl. ¶¶ 18–20; Declarations of C.L. ¶¶ 2–13; R.O. ¶¶ 2–4; E.W. ¶¶ 2–12.) This is not speculative: J.P.'s older child attended Woodside and Menlo-Atherton and experienced persistent breakdowns in accommodation implementation due to large caseloads and structural constraints. (J.P. Decl. ¶¶ 18–20).

**c.    Discrimination is by reason of disability**

The third element of Plaintiffs' prima facie case—that the discrimination is "by reason of" disability—is satisfied under both disparate impact\, deliberate indifference and reasonable accommodation theories. Plaintiffs need not prove that the District acted with animus toward students with disabilities. *A.J.T. v. Osseo Area Sch. Dist. No. 279*, 604 U.S. ___, 145 S. Ct. 1528 (2025) (rejecting heightened "bad faith or gross misjudgment" standard). Rather, Plaintiffs may establish this element by showing that the closure has a disparate impact on students with disabilities, that the District acted with deliberate indifference to that impact, or that the District failed to provide a reasonable accommodation. *Payan v. Los Angeles Cmty. Coll. Dist.*, 11 F.4th

14

MEMORANDUM

729, 738 (9th Cir. 2021); *Mark H. v. Hamamoto*, 620 F.3d 1090, 1097 (9th Cir. 2010). The evidence here satisfies all three.

### i.       Disparate Impact.

To establish a prima facie case under this theory, the plaintiff a must show: (1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices. *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 574-75 (2d Cir. 2003) (citing *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997)).

The District's closure of TIDE Academy is portrayed as an outwardly neutral practice of closing a small purportedly inefficient school.

However, the closure has a significantly adverse or disproportionate impact on the disabled population. The statistical disparity is stark and unrebutted. TIDE Academy's student body is 20.2% (total 37%) Students with Disabilities—more than double the rate at other District high schools such as Carlmont (9.2%). (J.P. Decl. ¶ 9, Ex. B at 3, 19.) The closure of TIDE will therefore eliminate the school that serves the highest concentration and the highest-achieving cohort of students with disabilities in the District. This is not a neutral policy that incidentally affects a protected class; it is the targeted elimination of the single campus that disproportionately serves that class. *See Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) (facially neutral policy violated ADA where it "burden[ed] visually-impaired persons in a manner different and greater than it burden[ed] others").

Critically, non-disabled students transferring from TIDE to comprehensive campuses face an inconvenience—a change in school assignment. Students with disabilities face a fundamentally different harm: the loss of the structural environment that makes education accessible to them. Multiple declarants attest that their children previously failed at large campuses before succeeding

15

MEMORANDUM

1    at TIDE, and that no amount of individualized accommodation on paper replicated what TIDE's

2    small-school structure provided in practice. (Declarations of C.L. ¶¶ 2–13; T.O. ¶¶ 2–7; E.W. ¶¶ 2–

3    12; J.M. ¶¶ 4–5; D.W. (re V.B.) ¶¶ 4–18; D.W. (re A.R.) ¶¶ 3–8.) This differential burden is the

4    hallmark of disparate impact. *See Lau v. Nichols*, 414 U.S. 563, 566-68 (1974) (facially neutral

5    policy that "effectively foreclose[s]" meaningful access to a public benefit violates federal civil

6    rights law).

7        The disproportionate concentration of students with disabilities at TIDE is not

8    coincidental—it is the direct and foreseeable consequence of the District's own conduct. The

9    District designed TIDE as a small school. It marketed TIDE as "a unique gem" offering "small

10   community" support with "more focus on students who are supported academically and social

11   emotionally." (Jambeck Decl. Ex. A at 18.)  It described TIDE's program as a "Whole School

12   Support." (*Id*. at Ex. A, Pg. 94, 95.) District counselors at other schools actively directed families of

13   students with disabilities to TIDE. (Declaration of R.O. ¶ 3.) Those families relied on the District's

14   representations, withdrew their children from failing placements, and enrolled them at TIDE—

15   where they thrived demonstrably.

16       Having induced families of students with disabilities to concentrate at TIDE, the District

17   cannot now eliminate that school without accounting for the foreseeable discriminatory impact of

18   its decision. The causal chain is direct: the District built the accommodation, told families to rely on

19   it, and now proposes to destroy it. The "by reason of" element is established not merely by the

20   statistical disparity, but by the District's own role in creating the conditions that make closure

21   uniquely harmful to students with disabilities. *Cf. Olmstead v. L.C.*, 527 U.S. 581, 597 (1999)

22   (recognizing that unjustified institutional segregation is itself a form of discrimination "by reason

23   of" disability); *see also Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003)

24

25

26                                    16

27                              MEMORANDUM

28

1    (government entity's failure to account for known discriminatory effect of facially neutral decision

2    constitutes discrimination under the ADA).

3        The District's own 504 coordinator at TIDE confirms that the services TIDE provides "are a

4    function of TIDE's small-school structure, not of any individual accommodation plan" and "cannot

5    be replicated by transferring a student's IEP or 504 Plan to a comprehensive campus of 2,000 or

6    more students." (Sandora Decl. ¶ 11.) As Ms. Sandora explains: "A 504 Plan can require that a

7    student have access to a wellness center, but it cannot make that wellness center one minute away,

8    staffed by professionals who know the student by name, and integrated with every other support

9    service the student needs." (*Id.*)

10       The disparate impact is further confirmed by the existence of a less discriminatory alternative

11   that achieves the identical financial objective. The District's own data, presented at the January 26,

12   2026 study session, identified that eliminating eight District Office administrative positions would

13   yield approximately $2.5 million in annual savings—the same amount the District projected from

14   closing TIDE Academy. (J.P. Decl. Ex. A at 119.) The District thus had before it two options

15   producing equivalent savings: one that eliminates central office positions and leaves intact the only

16   school serving a 37% population of students with disabilities, and one that closes that school and

17   scatters its disabled students across campuses where they have previously failed. The District chose

18   the latter without any documented analysis of why the option that destroys an accommodation for

19   students with disabilities was preferable to the one that does not. Under the implementing

20   regulations, a federally funded entity may not "utiliz[e] criteria or methods of administration" that

21   "have the effect of subjecting qualified handicapped persons to discrimination on the basis of

22   handicap" or that "have the purpose or effect of defeating or substantially impairing accomplishment

23   of the objectives of the recipient's program or activity with respect to handicapped persons." 34

24

25

26                                    17

27                               MEMORANDUM

28

1    C.F.R. § 104.4(b)(4)(i)–(ii). Where a public entity's own data demonstrates that a non-
2    discriminatory alternative achieves the same fiscal result, the decision to instead eliminate the
3    program disproportionately serving individuals with disabilities is a "method of administration" that
4    has the effect of discrimination—regardless of whether the District harbored any discriminatory
5    intent. See *Lau v. Nichols,* 414 U.S. 563, 568 (1974) (facially neutral administrative choice that
6    "effectively foreclose[s]" access violates federal civil rights law where alternatives exist).

7        ***ii.    Deliberate Indifference.***

8        Even if analyzed under a deliberate indifference framework, the evidence supports Plaintiffs'
9    claim. Deliberate indifference requires showing that "the defendant knew that harm to a federally
10    protected right was substantially likely and . . . failed to act on that likelihood." *Duvall v. County of*
11    *Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001). The District had actual knowledge that TIDE served a
12    disproportionate population of students with disabilities: it designed the school for that purpose, it
13    counseled families into the school, and its own School Accountability Report Cards documented the
14    20.2% rate. (J.P. Decl. ¶ 9, Ex. B at 3, 19.) Despite this knowledge, the District voted to close TIDE
15    without conducting any individualized assessment of the impact on students with disabilities,
16    without evaluating less discriminatory alternatives, and without complying with the procedural
17    requirements of 28 C.F.R. § 35.150(a)(3). (J.P. Decl. ¶¶ 5–6.) The District's FAQ page further
18    reveals its indifference: its only response to concerns about students with 504 plans was that
19    accommodations are "portable" and "fully implementable at larger comprehensive sites"—a
20    response that entirely ignores the structural setting that the District itself had identified as the
21    accommodation. (Jambeck Decl. Ex. D.) This is not mere negligence; it is a knowing decision to
22    disregard a substantially likely harm to students with disabilities. *See Payan*, 11 F.4th at 738–39

26                                        18

27                                  MEMORANDUM

1    (deliberate indifference established where institution "knew of and disregarded" discriminatory

2    impact on disabled students).

3          The District's indifference was not passive — it was active refusal to engage. Over a period

4    of forty-four days, the President of the TIDE Education Foundation, Andromeda Garcelon, sent

5    three separate emails to Superintendent Leach requesting community dialogue and a meeting to

6    discuss alternatives to closure. (Garcelon Decl. ¶¶ 3–12, Exs. A–C.) On December 10, 2025 — the

7    same day the Board directed the Superintendent to develop a closure timeline — Ms. Garcelon wrote

8    to Superintendent Leach offering to "work collaboratively and solve whatever the as-yet-unclarified

9    issues are for the District." (Garcelon Decl. ¶ 4, Ex. A.) That same evening, Superintendent Leach

10   publicly invited the community to join her in "thinking about every possible solution that could

11   make TIDE sustainable over the long term" and committed to a process providing "opportunities

12   for input and dialogue before any final decisions are made." (Garcelon Decl. ¶ 5.) On January 14,

13   2026, Ms. Garcelon wrote again in her formal capacity as TEF President, requesting both a

14   community forum and a personal meeting before the January 26 study session to brainstorm

15   sustainability ideas with District finance staff. She offered to meet at any time, at any location, in

16   any configuration the Superintendent preferred. (Garcelon Decl. ¶¶ 6–7, Ex. B.) She received no

17   response. On January 23, 2026, Ms. Garcelon sent a third email — this time copying all four

18   members of the Board of Trustees — noting that the Superintendent had "chose[n] not to hold the

19   promised community meeting," describing the District's timeline as a "rushed process," and

20   requesting that the Superintendent acknowledge her correspondence and propose a time to meet

21   before the February 4 vote. (Garcelon Decl. ¶ 9, Ex. C.) Neither Superintendent Leach nor any

22   member of the Board responded. (Garcelon Decl. ¶ 10.) The Board voted to close TIDE Academy

23   on February 4, 2026, without ever having provided the community dialogue its own process

24

25

26                                    19

27                              MEMORANDUM

28

required. (Garcelon Decl. ¶ 12.) A public entity that publicly invites community input, hires a communications consultant to manage the patina of engagement, and then refuses to respond to three written requests from the parent organization's president over forty-four days — including one copied to every Board member — is not deliberating in good faith. It is exhibiting the deliberate indifference to a known discriminatory impact that the Ninth Circuit has held violates Title II and Section 504. See *Duvall*, 260 F.3d at 1139.

The District's implementation of the closure compounds this indifference. The Board voted on February 4, 2026 to "move the academic program to Woodside High School." Yet the enrollment communication sent to families six days later did not offer moving the program to Woodside as an option—it directed families to select any school or be defaulted to their home campus. The practical effect is to scatter TIDE's approximately 200 students, including those with disabilities, across multiple comprehensive campuses. This is not what the Board voted for, and it is worse from a disability standpoint: it destroys the peer cohort that multiple declarants describe as essential to their children's social and emotional functioning, and it ensures that no single campus will receive a critical mass of TIDE students sufficient to justify preserving any element of TIDE's structural support model. A district that is aware its closure decision will disproportionately harm students with disabilities, and then implements that decision in a manner even more harmful than what was authorized, is not acting with mere negligence—it is acting with deliberate indifference to the consequences.

### iii.    *Failure to Provide Reasonable Accommodation.*

Finally, the closure constitutes the withdrawal of an existing reasonable accommodation, and the burden-shifting framework applicable to such claims confirms that Plaintiffs are likely to succeed on this theory.

20

MEMORANDUM

1    In the Ninth Circuit, a plaintiff asserting a failure-to-accommodate claim under the ADA or

2  Section 504 bears an initial burden of showing that (1) the plaintiff is a qualified individual with a

3  disability, and (2) the requested accommodation is reasonable. *Vinson v. Thomas*, 288 F.3d 1145,

4  1154 (9th Cir. 2002); *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816–18 (9th Cir. 1999). Once

5  the plaintiff makes this showing, the burden shifts to the defendant to demonstrate that the

6  accommodation would impose an undue burden or require a fundamental alteration of the program.

7  *Vinson*, 288 F.3d at 1154; 28 C.F.R. § 35.150(a)(3); *see also A.J.T. v. Osseo Area Sch. Dist. No.*

8  *279*, 604 U.S. ___, 145 S. Ct. 1528 (2025) (applying standard disability discrimination framework

9  to educational accommodation claims).

10    Both elements of Plaintiffs' initial burden are effectively conceded. First, Plaintiff A.P. is a

11  student with a qualifying disability, as are numerous members of Plaintiff TIDE Rising. (J.P. Decl.

12  ¶ 21.) The District's own School Accountability Report Card confirms that 20.2% of TIDE's student

13  body are Students with Disabilities but the true disabled population is approximately 37%. (J.P.

14  Decl. ¶ 9, Ex. B at 3, 19.) Second, the accommodation at issue—maintaining a small-school campus

15  that functions as a structural accommodation for students with disabilities—is not merely

16  reasonable; it is an accommodation the District itself created, promoted, and has been providing for

17  years. TIDE Academy currently exists. It is currently operating. The District designed it as a small

18  school, marketed it as the appropriate placement for students who could not succeed in large

19  comprehensive environments, and directed families of students with disabilities to enroll there.

20  (Declarations of R.O. ¶ 3; J.P. Decl. ¶¶ 16, 21.) The District described TIDE as a "Whole School

21  Support" in its own materials. (Jambeck Decl. Ex. A at 94–95.) An accommodation that a public

22  entity has already been providing is, by definition, a reasonable one. *See Zukle v. Regents of Univ.*

21

MEMORANDUM

1    *of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999) (reasonableness assessed in light of the totality of the

2    circumstances including a program's existing structure and resources).

3        Because Plaintiffs have satisfied their initial burden, the District must demonstrate that

4    continuing to operate TIDE Academy would constitute a fundamental alteration of its program or

5    impose an undue financial or administrative burden. *Vinson*, 288 F.3d at 1154; 28 C.F.R. §

6    35.150(a)(3). The District cannot make either showing.

7        The District cannot establish fundamental alteration. TIDE Academy *is* the District's

8    program—it is a public high school that the District created and has operated for years as part of its

9    portfolio of educational options. Continuing to operate a school that currently exists does not

10   "fundamentally alter" the District's educational program; closing it does. *See PGA Tour, Inc. v.*

11   *Martin*, 532 U.S. 661, 682–83 (2001) (modification is not a "fundamental alteration" where it is

12   consistent with the program's existing purposes and structure). The District has offered no evidence

13   that the continued operation of TIDE would alter the nature of any District program or service.

14       Nor can the District establish undue financial or administrative burden. The District holds a

15   "Positive Certification" with the State of California, confirming its ability to meet financial

16   obligations for the current and subsequent two fiscal years. (J.P. Decl. ¶ 13, Ex. C at 1.) The

17   Superintendent initially stated that finances were not the reason for considering closure. (J.P. Decl.

18   ¶ 2.) The District's own presentation admitted that per-student special education costs would "shift

19   in location" rather than decrease—meaning closure does not actually reduce the financial burden

20   but merely relocates it. (J.P. Decl. ¶ 3.) Indeed, the District's own study session data showed that

21   reducing eight District Office administrative positions would produce the same $2.5 million in

22   savings without eliminating any student-serving program. (J.P. Decl. Ex. A at 119.) And closure

23   will foreseeably *increase* costs: students who cannot function at large campuses will require Non-

24

25

26                                              22

27                                        MEMORANDUM

28

1    Public School placements costing $75,000 or more per year per student, far exceeding TIDE's per-

2    pupil cost. (Sandora Decl. at ¶12). A public entity that is fiscally stable, that concedes the

3    accommodation produces no net savings when eliminated, and that faces increased costs from

4    eliminating the accommodation cannot credibly claim undue burden.

5         Moreover, even if the District could substantively establish undue burden or fundamental

6    alteration, it has failed to comply with the mandatory procedural requirements for invoking those

7    defenses. Under 28 C.F.R. § 35.150(a)(3), "[t]he decision that compliance would result in such

8    alteration or burdens must be made by the head of the public entity or his or her designee after

9    considering all resources available for use in the funding and operation of the service, program, or

10   activity and must be accompanied by a written statement of the reasons for reaching that

11   conclusion." The regulation further provides that even where undue burden is established, the public

12   entity "shall take any other action that would not result in such an alteration or such burdens but

13   would nevertheless ensure that, to the maximum extent possible, individuals with disabilities receive

14   the benefits or services provided by the public entity." *Id.*

15        The District failed to satisfy any of these requirements. (J.P. Decl. ¶¶ 5–6.) The decision to

16   close TIDE was not accompanied by a written statement analyzing undue burden or fundamental

17   alteration as those terms are defined under Section 504 and Title II. The District did not demonstrate

18   that the Superintendent or Board—as the "head of the public entity or his or her designee"—formally

19   considered "all resources available" before concluding that maintaining TIDE was financially

20   untenable. And the District made no effort to identify alternative actions that would achieve

21   comparable cost savings without eliminating the only small-school accommodation for students

22   with disabilities—such as reducing administrative overhead, consolidating central office functions,

23   or restructuring operations at larger campuses. (J.P. Decl. ¶¶ 5–6.) The District's failure to comply

24

25

26                                          23

27                                     MEMORANDUM

28

with § 35.150(a)(3) is independently fatal to any undue burden or fundamental alteration defense. *See Townsend v. Quasim*, 328 F.3d 511, 518–19 (9th Cir. 2003) (state entity bears the burden of establishing fundamental alteration defense and must demonstrate it considered available alternatives); *see also Arc of Wash. State Inc. v. Braddock*, 427 F.3d 615, 620 (9th Cir. 2005) (public entity must show it has a "comprehensive, effectively working plan" and that the proposed action is consistent with its obligations to individuals with disabilities).

The District's failure is compounded by its refusal to engage in the interactive process required before withdrawing an existing accommodation. A public entity has an affirmative duty to engage in the interactive process with individuals with disabilities to identify reasonable accommodations, and that liability attaches when the interactive process breaks down due to the entity's failure to participate in good faith. *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002); *Payan v. L.A. Cmty. Coll. Dist.*, No. 2:17-cv-01697-SVW-SK, 2018 U.S. Dist. LEXIS 225042 (C.D. Cal. Oct. 16, 2018). *See also Humphrey v. Memorial Hospitals Ass'n*, 239 F.3d 1128, 1137–38 (9th Cir. 2001) ("[T]he employer has a duty to engage in the interactive process once it becomes aware of the need to provide accommodation."). Here, the District was not merely considering whether to grant a new accommodation—it was withdrawing one it had been providing for years. Before eliminating TIDE, the District was obligated to engage in an individualized interactive process with each affected student with a disability to determine what alternative accommodation could provide equivalent meaningful access. The District did nothing of the kind. Plaintiff J.P. specifically requested reasonable modification of the closure policy by emailing the Board of Trustees, Superintendent Leach, and District staff on January 29, 2026, proposing alternatives to closure. The District acknowledged receipt but provided no substantive response and refused to engage in the interactive process. (J.P. Decl. Ex. E.) Other members of TIDE Rising made similar requests for

24

MEMORANDUM

reasonable modification, which the District likewise ignored. (J.P. Decl. at ¶28). It apparently convened no IEP team meetings to assess the impact of closure on individual students. It apparently held no Section 504 meetings to evaluate whether alternative placements could provide comparable support. It apparently conducted no individualized assessments whatsoever. Instead, it voted to close the school and sent enrollment emails directing families to select a new campus. The District's wholesale failure to engage in any interactive process with any affected student independently establishes liability under the failure-to-accommodate theory. See *Duvall v. County of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001) (deliberate indifference established where entity failed to investigate feasible accommodations despite knowledge of need).

In sum, Plaintiffs have met their burden of showing that they are qualified individuals with disabilities and that the accommodation—TIDE Academy's continued operation—is reasonable. The burden has shifted to the District, which cannot demonstrate fundamental alteration or undue burden on the merits, has not complied with the procedural prerequisites for invoking those defenses, and failed entirely to engage in the interactive process required before withdrawing an existing accommodation. The failure-to-accommodate theory independently supports a finding of likelihood of success on the merits.

**4. The Closure Forces Students Into More Restrictive Environments**

The closure will constitute a regression on the continuum of placements for students with disabilities, moving them from "Full Inclusion" at TIDE to "Segregation" in Special Day Classes or isolated settings at large campuses. (Sandora Decl. at ¶12); 34 C.F.R. § 300.114–300.116. The District's own admission that special education costs will "shift in location" rather than decrease confirms that students will continue to need—but may not receive—the same level of support. (J.P. Decl. ¶ 3, Ex. A at 10). Ms. Pacheco confirms that closing TIDE and dispersing its students into

25

MEMORANDUM

comprehensive campuses of 2,000 or more "risks significant harm," that students who are "currently stable and succeeding in TIDE's environment may experience regression in their mental health and academic functioning," and that some "will foreseeably require more restrictive and more costly placements, including therapeutic classroom settings, non-public schools, or residential treatment." (Pacheco Decl. ¶ 9.)

The District's own Frequently Asked Question page includes an admission that the District failed to account for TIDE as a "method of administration" accommodating students with disabilities. (Jambeck Decl. Ex. D). The District states regarding 504 plans that: "Students with 504 plans at TIDE Academy already receive supports that are individualized, portable, and fully implementable at larger comprehensive sites." *Id.* This statement completely fails to account for the setting of TIDE which the District itself marketed, essentially, as an accommodation to students with disabilities.

The District's own data confirms this disparity. The newly issued 2024-2025 School Accountability Report Cards for Woodside High School and TIDE Academy reveal that Woodside maintains a pupil-to-academic-counselor ratio of 282:1, compared to TIDE's ratio of 110:1—nearly three times higher. Woodside's overall support-staff-to-student ratio is 109:1, compared to TIDE's 52:1:

26

MEMORANDUM

|  | Woodside | TIDE |
|---|---|---|
| Pupils to Academic Counselors | 282:1 | 110:1 |
| Support Staff - FTE |  |  |
| Counselor | 9 | 2 |
| Librarian | 1 | 0 |
| Library paraprofessional | 1 | 0 |
| Psychologist | 2 | 1 |
| Social worker | 0 | 0 |
| Nurse | 1 | 0.3 |
| Speech/language specialist | 1 | 0.3 |
| Resource Specialist | 0 | 0 |
| Total Support Staff | 15 | 4 |
| Students | 1640 | 200 |
| Ratio of SS to Students | 109.3 | 54.6 |

(J.P. Decl. Ex. D.)

Declarant E.W.'s experience illustrates this point. Her autistic daughter requires asynchronous English instruction due to emotional regulation challenges. TIDE permits this accommodation, but large comprehensive schools do not allow such credits to count toward graduation. Declaration of E.W. ¶ 10. Closure thus does not merely inconvenience this student—it eliminates her only viable path to a high school diploma within the District.

TIDE's Lead Counselor, who coordinates 504 services and has directly observed the impact of TIDE's model on students with disabilities, states that without TIDE's small campus and consolidated Wellness Center, "a number of our students would require transition to a more restrictive therapeutic classroom setting, such as the District's STARS program, or to residential or non-public school placements." (Sandora Decl. ¶ 10.) This is not speculative: it is the professional judgment of the staff member responsible for implementing 504 services at TIDE.

27

MEMORANDUM

**B. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief**

The Ninth Circuit has consistently held that the deprivation of constitutional and statutory civil rights constitutes irreparable harm. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'"). TIDE's Lead Counselor states that if TIDE closes, "students who are currently stable and succeeding will experience regression in their mental health and academic performance," that students who currently access wellness support independently "will face barriers to doing so at larger schools," and that students currently in the least restrictive environment "will, in my professional opinion, require more restrictive placements—at significantly greater cost to the District and significantly greater harm to the students." (Sandora Decl. ¶ 12.)

The irreparable harm here is both concrete and imminent:

**Educational Regression.** Students with disabilities who are forced into large comprehensive campuses will face educational regression. Multiple declarations attest that these students previously struggled or failed in large school environments before finding success at TIDE. Returning them to such environments will undo years of educational progress.

**Mental Health Deterioration.** Declarants describe students with anxiety disorders, autism, and sensory processing challenges who cannot tolerate the stimulation of large campuses. Forcing these students into overwhelming environments will exacerbate their mental health conditions. Declarant E.W. explains that her daughter "requires evenings and weekends to decompress and recover from the demands of the school day" even at TIDE; larger environments would "significantly increase her sensory and emotional load" and "would likely result in her being unable to attend school consistently." Declaration of E.W. ¶ 11.

28

MEMORANDUM

1

    **Loss of Educational Opportunity.** Some students face the loss of specific educational

2 pathways. Declarant C.L. explains that her child may lose the opportunity to take Pre-Calculus and

3 subsequently Calculus due to differences in course labeling between TIDE and comprehensive

4 schools. Declaration of C.L. ¶¶ 16-18. Declarant E.W.'s daughter cannot complete English through

5 traditional classroom instruction; TIDE's asynchronous option is the only path to graduation within

6 the District. Declaration of E.W. ¶ 10.

7     **Social Regression.** Declarants describe students who were previously bullied and isolated

8 but have found social acceptance at TIDE. Returning these students to large campuses where, as the

9 declarations indicate, educators throw up their hands and proclaim kids will be kids while that

10 continuously and historically has meant that disabled students become the target of ridicule and

11 derision threatens to undo critical social development.

12     This harm is irreparable because educational and developmental regression cannot be

13 adequately remedied by monetary damages after the fact. A student's formative educational years

14 cannot be relived. As Ms. Pacheco explains, when environmental supports are removed by

15 transferring a student from a small, structured environment to a large comprehensive campus, the

16 clinical literature shows "school avoidance, worsening mental health symptoms, social withdrawal,

17 and increased need for crisis intervention or intensive services, including partial hospitalization and

18 residential treatment." (Pacheco Decl. ¶ 6.) The displacement is, in her professional judgment,

19 "clinically contraindicated and educationally harmful"—"the equivalent of discontinuing an

20 effective treatment not because the treatment has failed, but because the provider has decided to stop

21 offering it." (Pacheco Decl. ¶ 10.)

22     The harm is further compounded and rendered truly irreparable by the District's decision to

23 scatter TIDE students across multiple campuses rather than consolidate them at a single site as the

24

25

26           29

27        MEMORANDUM

28

Board voted to do. Once TIDE's student body is dispersed, the structural accommodation is destroyed even if a court later orders TIDE reopened, because the peer community that declarants describe as central to their children's social and emotional development cannot simply be reassembled. Moreover, scattering students in small numbers across large campuses makes it functionally impossible to measure the harm after the fact. If all 200 TIDE students transferred to Woodside, a court could evaluate changes in attendance, grades, mental health referrals, and 504 compliance at a single site. By distributing ten students here and fifteen there, the District ensures that no campus shows a statistically significant decline attributable to the closure—not because the harm did not occur, but because it has been diluted below the threshold of measurability. This is precisely the kind of irreversible, unquantifiable harm that equity jurisdiction exists to prevent.

**C. The Balance of Equities Tips in Plaintiffs' Favor**

The balance of hardships tips sharply in Plaintiffs' favor. If the closure proceeds and Plaintiffs ultimately prevail on the merits, the harm to students with disabilities will be devastating and potentially permanent: educational regression, mental health deterioration, loss of educational opportunity, and social harm.

By contrast, maintaining the status quo imposes minimal burden on the District. The school is currently operating. Teachers are employed. Students are enrolled. The District has maintained a "Positive Certification" with the State indicating fiscal stability. The only hardship to the District is the delay of a discretionary policy choice—a choice that, if Plaintiffs prevail, would constitute unlawful discrimination.

At the vote on school closure, the District considered keeping TIDE open for up to two years. (J.P. Decl. ¶ 6). Given that the District considered a longer timeframe for closure, there is no

significant harm to the District in keeping the status quo and considering other less discriminatory alternatives to achieving their goals.

The District's proffered financial justification does not outweigh this balance. The District admitted that special education costs will "shift in location" rather than decrease, and closure may actually increase costs through Non-Public School placements. The District has not presented any evidence that maintaining TIDE for the pendency of this litigation will cause financial distress.

**D. The Public Interest Favors Injunctive Relief**

The public interest strongly favors enforcement of federal civil rights laws. Congress enacted the ADA and Section 504 to ensure that individuals with disabilities have equal access to public programs and services. The public interest in preventing discrimination against a protected class— particularly children with disabilities—is paramount.

Moreover, the public has a strong interest in ensuring that educational institutions provide appropriate accommodations for students with disabilities. TIDE Academy serves not only its current students but also provides an educational model demonstrating that students with disabilities can thrive in inclusive settings when provided appropriate structural supports.

The injunction requested here is narrowly tailored to maintain the status quo pending resolution on the merits. It does not require the District to create new programs or expend significant new resources. It simply requires the District to continue operating a school that currently exists and is currently serving students—the most vulnerable students in the District.

**V. EXHAUSTION OF ADMINISTRATIVE REMEDIES IS NOT REQUIRED**

Plaintiffs are not required to exhaust administrative remedies under the Individuals with Disabilities Education Act ("IDEA") because the gravamen of this Complaint is discrimination and systemic exclusion, not the adequacy of an individual student's Individualized Education Program.

31

MEMORANDUM

1    In *Fry v. Napoleon Community Schools*, 580 U.S. 154 (2017), the Supreme Court held that

2 IDEA's exhaustion requirement applies only "when the gravamen of a complaint seeks redress for

3 a school's failure to provide a FAPE." *Id.* at 169. The Court explained that "the IDEA guarantees

4 individually tailored educational services, while Title II and § 504 promise nondiscriminatory access

5 to public institutions." *Id.* at 168.

6    The Supreme Court provided a helpful test: could the plaintiff bring "essentially the same

7 claim if the alleged conduct had occurred at a public facility that was not a school"? *Id.* at 171. Here,

8 the answer is yes. The closure of TIDE Academy is analogous to a municipality closing the only

9 accessible public facility for individuals with disabilities. A plaintiff challenging such a closure

10 would not be required to exhaust IDEA procedures—because the claim is not about the adequacy

11 of individualized educational programming, but about systemic exclusion from public services.

12    This action challenges a "Method of Administration" under 34 C.F.R. § 104.4(b)(4)—the

13 systemic decision to eliminate a school site that functions as an accommodation for students with

14 disabilities. An Administrative Law Judge in a due process hearing cannot order a School Board to

15 keep a building open. The administrative process therefore cannot provide the relief sought,

16 rendering exhaustion futile.

17    Furthermore, in *Perez v. Sturgis Public Schools*, 598 U.S. 142 (2023), the Supreme Court

18 confirmed that plaintiffs need not exhaust IDEA procedures when seeking remedies that IDEA

19 cannot provide. Here, Plaintiffs seek an injunction preventing school closure—a remedy wholly

20 unavailable through IDEA's administrative process.

21    **VI. CONCLUSION**

22    For the foregoing reasons, Plaintiffs respectfully request that this Court issue a Temporary

23 Restraining Order and Preliminary Injunction enjoining Defendant Sequoia Union High School

32

MEMORANDUM

District from closing TIDE Academy or dispersing its student body until this matter can be fully adjudicated on the merits.

DATED: February 13, 2026                          **LEIGH LAW GROUP, P.C.**


By: _/s/Jay T. Jambeck_____
JAY T. JAMBECK
Attorney for Plaintiffs

33

MEMORANDUM