Richard W. Osman, State Bar No. 167993
Sheila D. Crawford, State Bar No. 278292
Ana K. Sanderson, State Bar No. 332737
BERTRAND, FOX, ELLIOT, OSMAN & WENZEL
The Waterfront Building
2749 Hyde Street
San Francisco, California 94109
Telephone: (415) 353-0999
Facsimile:  (415) 353-0990
Email:    rosman@bfesf.com
          scrawford@bfesf.com
          asanderson@bfesf.com

Attorneys for Defendant
SEQUOIA UNION HIGH SCHOOL DISTRICT

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIDE RISING, an unincorporated association of parents and guardians; A.P., a minor, by and through his Guardian ad Litem; J.P.<br><br>Plaintiffs,<br><br>v.<br><br>SEQUOIA UNION HIGH SCHOOL DISTRICT,<br><br>Defendant. | Case No. 3:26-cv-00987-TLT<br><br>**DEFENDANT SEQUOIA UNION HIGH SCHOOL DISTRICT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORAY RESTRAINING ORDER**<br><br>Date:      March 3, 2026<br>Time:      2:00 PM<br>Location:  Courtroom 9 – 19th Floor<br>           450 Golden Gate Ave<br>           San Francisco, CA 94102<br><br>**Hon. Trina L. Thompson** |

i

DEFENDANT SEQUOIA UNION HIGH SCHOOL DISTRICT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORAY RESTRAINING ORDER
*Tide Rising v. Sequoia Union High School District* | Case No. 3:26-cv-00987-TLT

# Table of Contents

I.  INTRODUCTION ...................................................................................................................1

II. BACKGROUND .....................................................................................................................1

III. LEGAL STANDARD ..............................................................................................................4

    1.  Mandatory TRO relief is subject to heightened scrutiny. .........................................4

    2.  Irreparable harm must be likely, not merely possible. ..............................................5

IV. ARGUMENT ...........................................................................................................................5

    A.  Plaintiffs seek a disfavored mandatory TRO and cannot satisfy the heightened standard. ....................................................................................................................5

    B.  Plaintiffs are not likely to succeed on the merits because federal disability law does not require the District to preserve a specific campus or program model, and the relief sought would exceed what Title II and Section 504 require. ..................................6

        1.  Title II and Section 504 prohibit disability discrimination. ......................................7

        2.  The ADA reasonable modification duty is not unlimited and does not require fundamental alteration. ..............................................................................................7

        3.  Plaintiffs cannot establish likely discrimination or denial of meaningful access. ....................................................................................................................8

    C.  Plaintiffs fail to show irreparable harm because their claimed injuries are speculative and not imminent. ..................................................................................8

    D.  The balance of equities and public interest weigh strongly against a TRO that would disrupt districtwide planning and dictate operational outcomes. ..........................10

    E.  A TRO is unnecessary in light of the evidence submitted by the District. ........................11

V.  CONCLUSION ......................................................................................................................11

ii

DEFENDANT SEQUOIA UNION HIGH SCHOOL DISTRICT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORAY RESTRAINING ORDER
*Tide Rising v. Sequoia Union High School District* | Case No. 3:26-cv-00987-TLT

**Table of Authorities**

**Cases**

*Alexander v. Choate*
    469 U.S. 287 (1985)......................................................................................................8

*Anderson v. United States*
    612 F.2d 1112 (9th Cir. 1979).........................................................................................4

*Bd. of Educ. v. Rowley*
    458 U.S. 176 (1982)......................................................................................................6

*Board of Curators of Univ. of Missouri v. Horowitz*
    435 U.S. 78 (1978)........................................................................................................6

*Bowen v. Gilliard*
    483 U.S. 587 (1987)....................................................................................................10

*Butt v. State of California*
    4 Cal. 4th 668 (1992)..................................................................................................10

*California Sch. Bds. Ass'n v. State of California*
    192 Cal. App. 4th 770 (2011) ....................................................................................10

*Ctr. for Food Safety v. Vilsack*
    636 F.3d 1166 (9th Cir. 2011) ......................................................................................5

*Cupolo v. Bay Area Rapid Transit*
    5 F.Supp. 1078 (N.D. Cal. 1987) ..............................................................................4, 5

*Dahl v. HEM Pharmaceuticals Corp.*
    7 F.3d 1399 (9th Cir. 1993) ..........................................................................................4

*Edge Games, Inc. v. Elec. Arts, Inc.*
    745 F. Supp. 2d 1101 (N.D. Cal. 2010) ........................................................................5

*Goldie's Bookstore, Inc. v. Superior Court of State of Cal.*
    739 F.2d 466 (9th Cir. 1984) ........................................................................................9

*Gregory K. v. Longview Sch. Dist.*
    811 F.2d 1307 (9th Cir. 1987) ..................................................................................6, 7

*Horne v. Flores*
    557 U.S. 433 (2009)..................................................................................................5, 10

*Johnson v. Cal. State Bd. of Accountancy*
    72 F.3d 1427 (9th Cir. 1995) ........................................................................................4

*Martin v. International Olympic Comm.*
    740 F.2d 670 (9th Cir. 1984) .....................................................................................4, 5

*Milliken v. Bradley*
    418 U.S. 717 (1974)..................................................................................................5, 10

*Missouri v. Jenkins*
    515 U.S. 70 (1995) ............................................................................................................. 5, 10

*Office of Pers. Mgmt. v. Richmond*
    496 U.S. 414 (1990) ................................................................................................................ 10

*Rizzo v. Goode*
    423 U.S. 362 (1976) ............................................................................................................. 6, 10

*Rodde v. Bonta*
    357 F.3d 988 (9th Cir. 2004) ..................................................................................................... 4

*Simula, Inc. v. Autoliv, Inc.*
    175 F.3d 716 (9th Cir. 1999) ..................................................................................................... 5

*Southeastern Community College v. Davis*
    442 U.S. 397 (1979) ................................................................................................................... 7

*Stanley v. Univ. of Southern Cal.*
    13 F.3d 1313 (9th Cir. 1994) ..................................................................................................... 4

*Winter v. Natural Resources Defense Council, Inc.*
    555 U.S. 7 (2008) ........................................................................................................ 4, 8, 9, 11

*Zukle v. Regents of University of California*
    166 F.3d 1041 (9th Cir. 1999) ................................................................................................ 6, 7

**Statutes**

29 U.S.C. § 794(a) ............................................................................................................................ 7

42 U.S.C. § 12132 ............................................................................................................................ 7

Americans with Disabilities Act, Title II, 42 U.S.C. §§ 12131–12134 ........................................... passim

Rehabilitation Act of 1973 § 504, 29 U.S.C. § 794 (2018) ............................................................. passim

**Regulations**

28 C.F.R. § 35.130(b)(7)(i) .............................................................................................................. 7

## I. INTRODUCTION

Plaintiffs are seeking extraordinary emergency relief that would override the Sequoia Union High School District's (the "District") governance decisions and effectively dictate school configuration and enrollment administration by preventing the District from both closing or ceasing operations at TIDE Academy ("TIDE") and enforcing a March 9, 2026 school selection deadline.

Under these circumstances, Plaintiffs are not seeking a narrow prohibitory order that preserves the status quo. They seek a mandatory TRO compelling the District to continue operating a particular school and program model and to halt districtwide enrollment planning. Mandatory preliminary injunctions are "particularly disfavored," are subject to heightened scrutiny, and should not issue unless the facts and law clearly favor the moving party.

Plaintiffs cannot meet that heightened standard. Title II of the ADA and Section 504 prohibit disability discrimination and require reasonable modifications when necessary, but they do not give Plaintiffs the right to freeze a school closure decision or to require the District to preserve a specific campus and institutional model. The District remains obligated to implement IEPs under IDEA and Section 504 plans regardless of school site. Plaintiffs' claimed harms are speculative and forward looking, and speculation is not irreparable harm. The Court should deny the TRO.

## II. BACKGROUND

TIDE Academy was created as an alternative, small-scale high school program within the District to serve students seeking a smaller learning environment or non-traditional structure. (Declaration of Crystal Leach ("Leach Decl.") ¶¶ 2–4.)It was not designed, approved, or designated as a therapeutic or special education campus, and it does not operate as a specialized placement for students with disabilities. (*Id*. ¶¶ 3–4.) TIDE is, and has always been, one of several comprehensive and alternative school options within the District. (*Id*. ¶ 5.) The presence of students with IEPs or Section 504 plans at TIDE reflects the District's obligation to serve students with disabilities across all of its campuses, not the existence of a disability-exclusive or disability-dependent program at TIDE. (Declaration of Ilja Van Laar ("Van Laar Decl.") ¶¶ 2–5.)

The District implements Individualized Education Programs ("IEPs") pursuant to the Individuals with Disabilities Education Act ("IDEA") and Section 504 plans pursuant to Section 504 of the

1

DEFENDANT SEQUOIA UNION HIGH SCHOOL DISTRICT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORAY RESTRAINING ORDER
*Tide Rising v. Sequoia Union High School District* | Case No. 3:26-cv-00987-TLT

Rehabilitation Act across all District school sites. (Van Laar Decl. ¶¶ 2–3.) An IEP is the governing document that specifies a student's individualized services, accommodations, supports, and placement, and those services are delivered by credentialed education specialists, related service providers, and support staff in accordance with the IEP. (*Id.* ¶¶ 7, 11.) Section 504 plans similarly set forth the accommodations and supports necessary to provide equal access to District programs and are implemented by site-based teams at each campus. (Van Laar Decl. ¶¶ 7, 11.) The District's obligation to implement IEPs and 504 plans applies regardless of school site, and the supports provided at TIDE are not unique to that campus nor dependent on its physical location. (*Id.* ¶¶ 3, 5, 7, 11.) Accordingly, students' services and accommodations are tied to their individualized plans rather than to attendance at a particular school facility.

Consistent with that understanding, and as part of broader enrollment and fiscal considerations affecting the District as a whole, the Board conducted an evaluation of TIDE's long-term viability along with other operational factors. On February 4, 2026, following a deliberative public process, the District's Board voted to close TIDE Academy effective June 30, 2026 and to relocate the academic program to Woodside High School beginning in the 2026–2027 school year. (Leach Decl. ¶¶ 11–13.) The closure decision applied to the entire school and all students enrolled at TIDE and followed a multi-month review process that began in November 2025 and included Board direction to develop a transition process, question-and-answer sessions with parents and staff, written FAQs, data and information sessions, and a public Board study session on January 26, 2026. (Leach Decl. ¶¶ 11, 14; District Website Closure Announcement, SUHSD Board Votes to Move TIDE Academy to Woodside High School Beginning in the 2026–27 School Year (Feb. 2026), attached as Exhibit A to Declaration of Crystal Leach.) Superintendent Leach presented multiple options to the Board, including keeping TIDE open for several additional years or closing TIDE in 2026. (*Id.* ¶¶ 12–13.) The recommendations were based on program viability, fiscal sustainability, student experience, and feasibility within operational constraints. (*Id.* ¶¶ 12–13.)

At the time the Board considered the closure, TIDE's enrollment had declined to approximately 195 students, with class sizes ranging from as few as four students to twenty-two students. (Leach Decl. ¶ 7.) TIDE was underenrolled relative to its operational capacity and overstaffed relative to its enrollment.

(*Id*. ¶ 8.) Consequently, its per-pupil expenditures were substantially higher than other District high schools. (*Id*. ¶¶ 6, 9–10.) The Board determined that maintaining a fully staffed comprehensive high school program at those enrollment levels was not fiscally sustainable. (*Id*. ¶ 10.)

In conjunction with the February 4, 2026 vote, the District asked families to indicate by March 9, 2026 whether they prefer enrollment at Woodside High School or another District school for the 2026–2027 school year. (Leach Decl. ¶¶ 15, 19.) The March 9 date is a logistics and staffing planning milestone intended to allow the District to determine staffing assignments and master scheduling for the upcoming school year. (*Id*. ¶¶ 19-20.) Students who do not make a selection will be assigned to their school of residence. (*Id*. ¶¶ 16–18.) Importantly, families may still request placement changes after the March 9 date. (*Id*. ¶¶ 16–18, 20.) Students will not attend new campuses until August 12, 2026. (*Id*. ¶ 21.) Prior to the next school year, the District will conduct individualized meetings with students and families to ensure continuity of student services following their placements. (*Id*. ¶¶ 19, 22-24.)

The District's publicly posted FAQ addresses disability-related support. As Plaintiffs acknowledge, the FAQ states: "Students with 504 plans at TIDE Academy already receive supports that are individualized, portable, and fully implementable at larger comprehensive sites." (Dkt. No. 29, Declaration of Jay Jambeck in Support of Injunctive Relief ("Jambeck Decl.") ¶ 8.) The District's evidence confirms that the same is true for IEP services. The District provides special education and related services across all school sites, and its obligation to implement IEPs and Section 504 plans applies regardless of the campus a student attends. (Van Laar Decl. ¶¶ 2–3, 11.)

Currently, 47 students at TIDE have IEPs and 32 students have Section 504 plans. (Van Laar Decl. ¶ 5.) After graduating seniors, 34 students with IEPs and 26 students with Section 504 plans will transition to other District sites. (*Id*.) The special education supports provided at TIDE are not unique to that campus and are not dependent on its physical location. (*Id*. ¶¶ 6-11; Leach Decl. ¶¶ 26-27.) **No student's IEP or 504 plan requires services to be delivered at TIDE specifically.** (*Id*. ¶¶ 6-13.) All District school sites have staff and systems in place to implement IEPs and Section 504 plans, and the District can assign, reassign, or hire personnel as necessary to ensure required services are delivered at receiving campuses. (*Id*. ¶¶ 6–13.)

Once a student's site placement is identified, the District will review the student's IEP or Section

3

504 plan, ensure staff at the receiving campus are prepared to implement required services and accommodations, and convene meetings as needed to ensure continuity. (Leach Decl. ¶¶ 23–24; Van Laar Decl. ¶ 9.) The District remains legally obligated to implement all IEPs and Section 504 plans without interruption. (Leach Decl. ¶¶ 22, 38–40; Van Laar Decl. ¶¶ 10, 13.)

The record before the Court reflects that the District's decision is being implemented in an orderly and deliberate manner consistent with its ongoing legal obligations. To the extent Plaintiffs suggest that the transition creates an emergency or renders relief impossible, the evidence demonstrates otherwise. Specifically, Defendants will submit evidence establishing that: (1) students remain enrolled and served through June 30, 2026; (2) the District will continue to implement IEPs and Section 504 plans regardless of school site; (3) the March 9 deadline is an administrative planning milestone for staffing and master scheduling, not an attempt to evade judicial review; and (4) the District has not taken irreversible steps that would prevent effective relief if Plaintiffs ultimately prevail.

### III.  LEGAL STANDARD

A TRO is an extraordinary remedy. Plaintiffs must establish: (1) likelihood of success on the merits, (2) likelihood of irreparable harm absent relief, (3) that the balance of equities tips in their favor, and (4) that an injunction is in the public interest. (*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Rodde v. Bonta*, 357 F.3d 988, 994 (9th Cir. 2004) citing *Johnson v. Cal. State Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir. 1995).)

**1.   Mandatory TRO relief is subject to heightened scrutiny.**

When a plaintiff seeks a mandatory injunction that goes beyond preserving the status quo and compels affirmative action, courts apply heightened scrutiny and do not grant relief unless the facts and law clearly favor the moving party. (*Stanley v. Univ. of Southern Cal*., 13 F.3d 1313, 1319-1320 (9th Cir. 1994).) Preliminary injunctions that require the enjoined party to undertake affirmative conduct "should not be issued unless the facts and the law clearly favor the moving party." (*Cupolo v. Bay Area Rapid Transit*, 5 F.Supp. 1078, 1082 (N.D. Cal. 1987) citing to *Dahl v. HEM Pharmaceuticals Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993); *see also Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979); *see also Martin v. International Olympic Comm.*, 740 F.2d 670, 675 (9th Cir. 1984) (when party "seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite*, courts

4

DEFENDANT SEQUOIA UNION HIGH SCHOOL DISTRICT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORAY RESTRAINING ORDER
*Tide Rising v. Sequoia Union High School District* | Case No. 3:26-cv-00987-TLT

should be extremely cautious about issuing a preliminary injunction.") As discussed below, Plaintiffs have not and cannot meet the Ninth Circuit's heightened standard for mandatory injunctive relief.

### 2. Irreparable harm must be likely, not merely possible.

A "possibility" of irreparable harm is too lenient. Plaintiffs must show irreparable injury is *likely* in the absence of an injunction, not just possible. (*Ctr. for Food Safety v. Vilsack,* 636 F.3d 1166, 1172-1173 (9th Cir. 2011); *see also Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 725 (9th Cir. 1999) (preliminary injunction requires "significant threat of irreparable injury").) Irreparable harm is absent where an award of monetary damages "or some other legal remedy at a later date" will make the plaintiff whole. (*Edge Games, Inc. v. Elec. Arts, Inc.,* 745 F. Supp. 2d 1101, 1117 (N.D. Cal. 2010).) Under the present circumstances, Plaintiffs cannot make a showing of irreparable harm.

### IV.   ARGUMENT

**A.   Plaintiffs seek a disfavored mandatory TRO and cannot satisfy the heightened standard.**

Plaintiffs ask the Court to halt implementation of a Board decision and to stop the District from administering the March 9 enrollment planning deadline. This request would compel affirmative conduct and alter the status quo. The Ninth Circuit is "extremely cautious" about mandatory preliminary injunctions and applies heightened scrutiny. (*Martin*, 740 F.2d at p. 675.) Mandatory injunctions are particularly disfavored and should not issue unless the facts and law clearly favor the moving party. (*Cupolo*, 5 F. Supp. at 1082.) Plaintiffs' showing falls well short.

Granting the requested TRO would force the District to undo months of planning, freeze staffing and budgeting decisions, and operate a school it has determined is fiscally unsustainable. Courts are particularly reluctant to issue mandatory relief that intrudes upon public entities' policy and budgetary determinations. (*See Horne v. Flores*, 557 U.S. 433, 448 (2009) holding, "Federalism concerns are heightened when, as in these cases, a federal court decree has the effect of dictating state or local budget priorities. States and local governments have limited funds. When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs."; *see also Missouri v. Jenkins*, 515 U.S. 70, 131 (1995) (Thomas, J., concurring) noting, "Federal courts 'do not possess the capabilities of state and local governments in addressing difficult educational problems.'"; *see also Milliken v. Bradley*, 418 U.S. 717, 741–42 (1974) holding, "No single tradition in public

5

education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process."; *see also Rizzo v. Goode*, 423 U.S. 362, 378 (1976) holding that, "[W]here…the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the 'special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law.'")Because Plaintiffs seek to compel operational and fiscal decisions of the District, not merely to prevent imminent harm, they must make a clear showing that the law and facts overwhelmingly favor them. They have not done so.

**B.   Plaintiffs are not likely to succeed on the merits because federal disability law does not require the District to preserve a specific campus or program model, and the relief sought would exceed what Title II and Section 504 require.**

The Ninth Circuit has held that the ADA cannot be used as a discretionary tool for parents to unilaterally force their preferred educational placement. (*Gregory K. v. Longview Sch. Dist.,* 811 F.2d 1307, 1314 (9th Cir. 1987) (a school district's proposed placement is not inappropriate because the student's parents prefer an alternative placement). Additionally, "An 'appropriate' special public education does not mean the absolutely best or "potential-maximizing" education for the individual child." (*Id*. at 1314 citing to *Bd. of Educ. v. Rowley,* 458 U.S. 176, n.21 (1982).) Furthermore, the Ninth Circuit has held that educational institutions' academic decisions are entitled to deference in the context of ADA and Rehabilitation Act cases. (*See Zukle v. Regents of University of California*, 166 F.3d 1041, 1047 (9th Cir. 1999); *see also Board of Curators of Univ. of Missouri v. Horowitz,* 435 U.S. 78, 92 (1978) concluding that "[c]ourts are particularly ill-equipped to evaluate academic performance.").

Here, Plaintiffs' likelihood of success argument rests on a fundamental mischaracterization of federal disability law. They do not allege that the District has refused to implement any student's IEP or Section 504 plan. Nor do they identify any service that will be unavailable at receiving campuses. Instead, Plaintiffs contend that the District must preserve TIDE Academy itself because its small size and program structure are *preferable* for certain students. But neither Title II nor Section 504 transforms a preferred school campus, enrollment model, or educational configuration into a legally-mandated accommodation. Federal disability law protects against exclusion and unequal treatment. It does not freeze public entities' policy decisions regarding school consolidation, staffing, or campus organization

6

so long as students with disabilities continue to receive equal access to services and reasonable accommodations.

1.  **Title II and Section 504 prohibit disability discrimination.**

Title II provides that no "qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." (42 U.S.C. § 12132.) Section 504 similarly provides that no "otherwise qualified individual with a disability" shall, "solely by reason of her or his disability," be excluded from participation in, denied benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance. (29 U.S.C. § 794(a).)

Here, Plaintiffs' theory attempts to convert a preference for the TIDE setting into a right to keep a particular school open. But Title II and Section 504 are anti-discrimination statutes. They require equal access and reasonable accommodation, not judicial takeover of school district configuration decisions entitled to deference. (*See Zukle*, 166 F.3d at 1047.) So long as students with disabilities continue to receive the services and accommodations to which they are entitled, federal disability law does not authorize courts to override neutral, broadly applicable policy decisions about school consolidation or program configuration based on student preference. (*See Gregory K.*, 811 F.2d at 1314.)

2.  **The ADA reasonable modification duty is not unlimited and does not require fundamental alteration.**

The Title II regulation requires a public entity to make reasonable modifications in policies, practices, or procedures when necessary to avoid discrimination, unless the entity can demonstrate the modification would fundamentally alter the nature of the service, program, or activity. (28 C.F.R. § 35.130(b)(7)(i).) The Ninth Circuit has held that both the ADA and the Rehabilitation Act do not require an institution to "make fundamental or substantial alterations to its programs or standards." (*Zukle v. Regents of the Univ. of Calif.,* 166 F.3d 1041, 1046 (9th Cir. 1999); see also *Southeastern Community College v. Davis,* 442 U.S. 397, 413 (1979), holding that modifications that would have compromised the essential nature of the college's nursing program were unreasonable.) "The balance struck in *Davis* requires that an otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. The benefit itself, of course, cannot be defined in a way that effectively

denies otherwise qualified handicapped individuals the meaningful access to which they are entitled; to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made." (*Alexander v. Choate*, 469 U.S. 287, 301 (1985).)

A TRO compelling the District to keep operating a specific campus and to suspend districtwide enrollment planning is not a modest modification. It is a fundamental alteration of the District's governance decision and its districtwide staffing and scheduling process. Plaintiffs do not show the ADA requires that outcome. Indeed, it does not. Plaintiffs identify no authority suggesting that Title II or Section 504 obligates a school district to preserve a particular campus. Plaintiffs seek relief far beyond what the ADA requires. Moreover, because the District remains committed, and legal obligated, to implementing all IEPs and Section 504 plans at receiving campuses, the relief Plaintiffs seek is unnecessary.

       **3.**    **Plaintiffs cannot establish likely discrimination or denial of meaningful access.**

Plaintiffs do not identify any student who is currently being denied IEP services, 504 accommodations, or meaningful access to a public education because of disability. Nor do they point to any provision of any IEP or 504 plan that the District has refused to implement. Their harm case rests on predictions and speculation about what <u>may</u> occur after a transition and generalized fears about larger campuses. That is not a likelihood of success showing.

Such conjecture does not establish that discrimination is occurring, or is likely to occur, within the meaning of Title II or Section 504. The ADA does not require a public entity to guarantee that every student will prefer the setting in which services are delivered; it requires only that students with disabilities receive equal access and reasonable accommodations.

**C.**    **Plaintiffs fail to show irreparable harm because their claimed injuries are speculative and not imminent.**

Under *Winter*, Plaintiffs must show irreparable harm is likely, not merely possible. (*Winter*, 555 U.S. at 20.) Plaintiffs' declarations describe anxiety, uncertainty, and predicted negative outcomes if students move campuses. Those are not imminent injuries establishing that irreparable harm is likely before the merits can be adjudicated but rather speculative fears of future harm which are insufficient to warrant emergency injunctive relief. (*See Goldie's Bookstore, Inc. v. Superior Court of State of Cal.,* 739

8

F.2d 466, 472 (9th Cir. 1984), holding that speculative injury does not constitute irreparable injury.) Furthermore, any alleged injury depends on a chain of assumptions including that services will not transfer, that placements will be inappropriate, and that support structures will fail. These assumptions are not only unsupported by the record but are also directly contradicted by the District's sworn declarations. Such conjecture cannot satisfy *Winter*'s stringent irreparable harm requirement.

The District is taking proactive steps to ensure continuity of services for all students transitioning from TIDE, including meeting individually with each student and family to develop a transition plan once site placement is determined. (Leach Decl. ¶¶ 19, 23–24.) This individualized process includes review of each student's existing IEP or Section 504 plan, coordination with staff at the receiving campus, and advance planning to ensure that required accommodations and related services are in place before the start of the 2026–2027 school year. (Leach Decl. ¶ 24; Van Laar Decl. ¶¶ 7–10.) The services provided pursuant to IEPs and Section 504 plans are not unique to TIDE and are implemented across all District school sites. (Van Laar Decl. ¶¶ 38, 13.) Many TIDE students who have IEPs or Section 504 plans receive routine services and accommodations commonly provided at all District campuses. (Leach Decl. ¶¶ 25, 27-28; Van Laar Decl. ¶ 7.) Because these services are portable and will remain available regardless of site placement, Plaintiffs' claimed injuries amount to speculation about potential future dissatisfaction with a different campus environment rather than imminent deprivation of any legally required services after placement at a new campus.

Furthermore, Plaintiffs argue the March 9, 2026 date creates an "urgent need" for judicial intervention and that families will be forced to commit to placements that "moot" relief. That framing is incorrect. The March 9 date is a logistics and staffing planning date, not an emergency cutoff for student services or an irreversible commitment. (Leach Dec. ¶¶ 18-20, 38-42.) The District requested that families indicate by March 9 whether they prefer Woodside High School or a different District school so the District can plan staffing and scheduling for the 2026–2027 school year. (*Id*. at ¶¶ 15, 19.) If a student initially selects Woodside High School and later changes that preference before the school year begins, the District can still accommodate that change. (*Id*. at ¶¶ 17-19.) In all events, a student's IEP or 504 plan remains in effect regardless of the site selection, and the District's obligation to implement those plans continues without interruption. (*Id*. at ¶¶ 22-24; Van Laar Decl. ¶¶ 7-13.) Because March 9 is a planning

9

milestone rather than an emergency deadline, Plaintiffs cannot establish that irreparable harm is likely or imminent before the Court can adjudicate the matter on the merits.

**D.    The balance of equities and public interest weigh strongly against a TRO that would disrupt districtwide planning and dictate operational outcomes.**

The Court must consider the balance of equities and public interest, both of which require denial of the requested TRO. Here, the requested TRO would disrupt districtwide staffing allocations, master schedule development, and resource planning for multiple campuses, affecting students and families far beyond the Plaintiffs in this case. Courts are particularly cautious when asked to grant relief that would force an institution to redirect resources and change operational planning. (*See Horne*, 557 U.S. at 448; *see also Jenkins*, 515 U.S. at 131 (Thomas, J., concurring); *see also Rizzo*, 423 U.S. at 378; *see also Milliken*, 418 U.S. at 741–42.) The equitable restraint principles that animate heightened scrutiny of mandatory injunctions apply with full force here.

Both federal and state law recognize that courts may not compel public entities to expend funds in a manner not authorized by governing bodies or to override core fiscal and policy determinations committed to elected officials. (*See Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424–25 (1990) (courts may not order payment of funds absent lawful authorization); *Bowen v. Gilliard*, 483 U.S. 587, 598 (1987) (governmental decisions about how to spend public funds are matters of legislative policy); *see also California Sch. Bds. Ass'n v. State of California*, 192 Cal. App. 4th 770, 798–99 (2011) (recognizing limits on judicial authority to direct appropriations or reallocation of public funds); *Butt v. State of California*, 4 Cal. 4th 668, 695–703 (1992) (emphasizing separation-of-powers constraints in fiscal matters).) The authority to allocate public resources, including decisions about school operations, staffing, and campus configuration, rests with the District's governing Board, not the judiciary.

An order compelling the District to continue operating TIDE would necessarily require the expenditure of millions of dollars in staffing and operational costs that the Board has determined are fiscally unsustainable and has voted not to incur. (Leach Decl. ¶¶34-37, 42.) Courts are not empowered to substitute their judgment for that of local officials on how limited educational funds should be allocated among competing priorities. (*See Horne*, 557 U.S. at 448; *see also Jenkins*, 515 U.S. at 131 (Thomas, J., concurring); *see also Rizzo*, 423 U.S. at 378; *see also Milliken*, 418 U.S. at 741–42.)

Granting the requested TRO would intrude upon the District's core budgetary authority and require judicial control over how public education funds are deployed which neither the ADA nor Section 504 authorizes.

In addition, the requested TRO would create significant logistical disruption across the District, to the detriment of students, teachers, and support staff who are not parties to this litigation. (Leach Decl. ¶¶ 19, 30–33, 42.) Enrollment planning, master scheduling, staffing assignments, and course offerings for the 2026–2027 school year are already underway and depend on knowing where students will enroll. (*Id*. ¶¶ 19, 30–32.) Freezing implementation of the Board's decision, including the March 9, 2026 school election date, would leave teachers and classified staff in limbo, delay hiring and reassignment decisions, and impair the District's ability to finalize schedules and allocate resources for all campuses. (*Id*. ¶¶ 29–33, 41–42.) Such uncertainty would not be limited to TIDE; it would ripple across receiving schools and affect hundreds of other students who rely on stable course scheduling and staffing. The public interest does not favor judicial intervention that disrupts districtwide planning and creates uncertainty for educators, administrators and students alike, particularly where Plaintiffs have not demonstrated imminent denial of any legally required services.

**E.    A TRO is unnecessary in light of the evidence submitted by the District.**

Based on the evidence submitted by the District through the declarations of Superintendent Crystal Leach and Executive Director of Special Education Ilja Van Laar, it is clear that a TRO preventing the District from seeking parental decisions for student placements by March 9 is completely unnecessary. As confirmed by Superintendent Leach and Executive Director Van Laar: no student will be involuntarily transferred to another school before June 30, 2026; the District will be holding individualized transition meetings for families with students on IEPs or 504 plans to ensure continuity of services; and families will be provided with flexibility in making school selection decisions after March 9, as the Superintendent retains discretion to accommodate late requests. Because these administrative measures ensure that no immediate or irreparable harm exists, judicial intervention is unwarranted.

## V.    CONCLUSION

Plaintiffs seek disfavored mandatory TRO relief. They do not show likely success under Title II or Section 504, they do not show irreparable harm is likely as *Winter* requires, and the balance of equities

11

DEFENDANT SEQUOIA UNION HIGH SCHOOL DISTRICT'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORAY RESTRAINING ORDER
*Tide Rising v. Sequoia Union High School District* | Case No. 3:26-cv-00987-TLT

1  and public interest weigh strongly against judicial intrusion into districtwide staffing, scheduling, and
2  governance decisions. The Court should deny the TRO.

4  Dated: February 24, 2026                    BERTRAND, FOX, ELLIOT, OSMAN & WENZEL

6                                              By:  /s/ Richard W. Osman
7                                                   Richard W. Osman
                                                    Sheila D. Crawford
8                                                   Ana K. Sanderson
                                                    Attorneys for Defendant
9                                                   SEQUOIA UNION HIGH SCHOOL DISTRICT